United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORNELIUS HOLANI,
Petitioner,

v.

SERGIO ALBARRAN, et al.,
Respondents.

Case No. 26-cv-08013-NW

**ORDER DENYING MOTION TO DISMISS, ISSUING PRELIMINARY INJUNCTION, AND DIRECITING PARTIES TO MEET AND CONFER RE EVIDENTIARY HEARING**

Re: ECF No. 17, 22

Petitioner Cornelius Holani, a 20-year-old citizen of New Zealand, came to the United States in 2023 under the Visa Waiver Program ("VWP"). He overstayed his period of admission in October 2023, but has been living in this country with his mother, U.S.-citizen stepfather, and caring for his elderly grandmother, since then without incident. This matter arises from his 'verified petition for writ of habeas corpus filed on July 31, 2026, after he was detained without any warning or process at Oakland International Airport. ECF No. 1. On August 4, 2026, the Court granted Petitioner's motion for temporary restraining order ("TRO") pending a supplemental response from Respondents (collectively, the "government") and an opportunity for a hearing. *See* ECF No. 14.

The government's supplemental response/opposition to the TRO and petition included a motion to dismiss the petition on the ground that on the day Mr. Holani was arrested he signed a form stating that "I wish to be removed from the United States" – a form he claims he only signed based on the government's fraud and coercion. ECF No. 17 at 2. The Court held a hearing on August 13, 2026. On August 21, 2026, with the Court's permission, Petitioner filed a reply. ECF Nos. 20, 22. At the hearing and in his reply, Petitioner sought to convert the TRO into a preliminary injunction pending resolution of his petition. *See* ECF No. 22 at 19–20. The Court

held a subsequent hearing on September 8, 2026, and issued its ruling on the record, indicating that this written order would follow. Having considered the parties' submissions and the relevant law, for the following reasons, the Court DENIES the government's motion to dismiss and GRANTS Petitioner's request for a preliminary injunction pending an evidentiary hearing to resolve disputed facts.

## I. FACTUAL BACKGROUND

The facts of this matter are drawn from Petitioner's verified petition and the parties' myriad exhibits and declarations submitted with the briefing in this matter. *See* ECF Nos. 1, 3, 7, 13, 17, 22 (and attachments).

### A. Mr. Holani's Background

Mr. Holani is a 20-year-old citizen of New Zealand of Tongan ethnicity. ECF No. 1 ¶¶ 1, 27. On July 13, 2023, when he was 17 years old, he was lawfully admitted to the United States on a VWP. *Id.* His mother is a green card holder who obtained her green card through marriage to Mr. Holani's stepfather, a U.S. citizen. *Id.* ¶¶ 1, 29; ECF No. 22-3 (reply declaration of Lota Maka, Mr. Holani's mother; "Lota Reply Decl.") ¶¶ 1–2; ECF No.22-4 (declaration of Viliami Maka Jr., Mr. Holani's stepfather; "Viliami Decl.") ¶1. Mr. Holani's authorized period of admission expired in October 2023, after which he remained in the United States. ECF No. 1 ¶ 3 (typographical error erroneously stating 2022).

Mr. Holani has deep ties to his community and family. He: volunteers with his local church community, teaching traditional Tongan dance to the children of his church five days a week; volunteers additional time cleaning and fixing the church building; volunteers in his broader local community with a non-profit football organization, Oakland Dynamites, cleaning equipment and helping children fit their uniforms; and volunteers teaching Tongan dance to local youth groups. He is close with both his mother and stepfather, who live in Oakland, and he serves as a caregiver to his elderly grandmother in Seattle, travelling between Oakland and Seattle frequently. *Id.* ¶¶ 1, 4–5, 7, 29–30; Lota Reply Decl. ¶¶ 2, 4–8; Viliami Decl. ¶¶ 2–5; ECF No. 22-2 ("Holani Reply Decl.") ¶¶ 4, 6 (Mr. Holani's grandmother "depends on [his] support for key physical demands around the house, including running errands, household duties, grocery shopping, and

gardening."); *see also* ECF No. 3-3, Ex. D.

Mr. Holani has no criminal record and no history of immigration enforcement contact of any kind prior to the events of July 31, 2026. *See* ECF No. 1 ¶¶ 3, 28, 31; Holani Reply Decl. ¶¶ 2, 5.

**B. The July 31, 2026 Arrest and Surrounding Circumstances**

On July 31, 2026, Mr. Holani "arrived at Oakland International Airport around 7:18 a.m. to fly to Seattle to see [his] grandmother and to get ready for a church dance that Saturday." ECF No. 1 ¶¶ 2, 32; Holani Reply Decl. ¶ 7. After he checked in and was waiting at the departure gate, four plain-clothes officers from Immigration and Customs Enforcement ("ICE") approached him. *Id.* They surrounded Mr. Holani and told him not to make a scene, identified themselves, and asked for his identification. ECF No. 1 ¶¶ 33; Holani Reply Decl. ¶ 8. At that time, Mr. Holani called his mother, although the ICE officers told him he was not allowed to, and told her that he was being taken; he sounded "panicked" and "nervous[,]" and the call ended shortly after he was told to hang up by the ICE officers. Holani Reply Decl. ¶¶ 8; Lota Reply Decl. ¶¶ 10–11.

Mr. Holani was then arrested and handcuffed. ECF No. 1 ¶¶ 33–34; Holani Reply Decl. ¶ 10; *see also* ECF No. 17-1 ("ICE Decl.") ¶ 5.[1] He cooperated and "did not fight back or resist in any way." *Id.* The ICE officers took him to a police car. *Id.* They did not read him any rights, telling him "only that [his] visa has expired" and that he could voluntarily self-deport, or he could "fight [his] case, and it might not work out." *Id.*

After some time, Mr. Holani was transferred to a van, with the ICE officers placing leg irons on him and a chain around his waist. ECF No. 1 ¶¶ 34; Holani Reply Decl. ¶ 11. When Mr. Holani asked if he could speak to his mother, he was told "When we're done processing you." *Id.* "Processing" Mr. Holani at the San Francisco office took some time, including many attempts to get his fingerprints as his "hands were so sweaty that when officers tried to take [his] fingerprints, they could not get a proper reading." Holani Reply Decl. ¶ 13. During that time, while Mr.

---

[1] In support of its motion to dismiss and opposition to the injunction, the government submitted the declaration of Marco Grasso, an ICE officer within the San Francisco Field Office of Enforcement and Removal Operations, who participated in the arrest of Mr. Holani.

Holani was sitting on his own, "an officer approached [him] and stated that if [he] agreed to voluntary departure, the government 'would give [him] money to go back home.'" *Id.* After several hours, Mr. Holani was finally allowed to see his mother, stepfather, and an attorney in a visiting room. *Id.* ¶ 14.

While he was speaking to his parents and attorney, an ICE officer came in and told Mr. Holani that he was needed. *Id.* ¶ 15. He followed the officer to another room, where the officer stood at a desk while another officer stood behind Mr. Holani holding the door open. *Id.* ¶ 16. The parties' accounts differ as to what occurred next. Mr. Holani avers that the officer said, "I have papers for you to sign." *Id.* When Mr. Holani asked whether they "have anything to do with deportation," the officer replied, "No, it's nothing like that." *Id.* Assured, Mr. Holani signed the documents. *Id.* But the documents Mr. Holani signed were related to his deportation, including an acknowledgment of the government's Notice of Intent To Issue a Final Removal Order ("Notice of Intent") including a checked box stating: "I admit the allegations and charge(s) in this Notice[ and] do not wish to request Asylum, withholding or Deferral of Removal. I wish to be removed from the United States to my country of nationality, citizenship, or last residence." *Id.*; ECF No. 7-1 at 4–5. Among the papers was a certificate of service of the corresponding Final Removal Order. ECF No. 17-2. Mr. Holani states he did not check any of the boxes himself. Holani Reply Decl., ¶ 16. He also "felt so pressured from the[ officers'] presence and actions" that he couldn't get himself to read the document prior to signing, and that the officer "immediately grabbed the papers after [Mr. Holani] signed [them]." *Id.* Mr. Holani recounts that the papers were in front of him for less than a minute, and that in addition to representing that they weren't "anything to do with deportation," the ICE officers never told Mr. Holani that, if he wished to contest the factual allegations or his removability as contained in the Notice of Intent, he had 48 hours to do so, he could gather evidence prior to responding, and he could speak to a lawyer prior to signing. *Id.* ¶ 17.

Officer Grasso was the ICE officer who served Mr. Holani with the documents. ICE Decl. ¶ 6. He does not dispute most of Mr. Holani's allegations as to the circumstances surrounding Mr. Holani's signing of the acknowledgment but claims that he "provided Mr. Holani with the

opportunity to read the documents before signing them" and "did not coerce Mr. Holani to sign any document." *Id.* ¶¶ 7-8. He does dispute Mr. Holani's account of the representation as to the documents' topic, declaring: "I did not tell him that the documents had nothing to do with deportation." *Id.*

After signing, Mr. Holani was returned to the visiting room for a couple of hours before he was removed and transported to a detention facility in Bakersfield, California. Holani Reply Decl. ¶¶ 18–19. Mr. Holani was ultimately released on August 4, 2026, as ordered by this Court. *Id.* ¶ 24; ECF No. 14.

**C. Mr. Holani's Application for Adjustment of Visa Status**

After his release, Mr. Holani, sponsored by his U.S-citizen stepfather, began the process of seeking adjustment of status. Holani Reply Decl. ¶¶ 26–27; Viliami Decl. ¶ 3. That application was filed on August 21, 2026. *See* ECF No. 22-5. Mr. Holani, as well as his mother and stepfather, aver that he has always lived here "openly" and it has long been his goal to obtain lawful status in the United States – and that his stepfather had already agreed to sponsor him prior to his detention. Holani Reply Decl. ¶¶ 26–27; Lota Reply Decl. ¶¶ 3, 8; Viliami Decl. ¶ 3.

## II. LEGAL STANDARD

**A. Motion to Dismiss for Lack of Subject Matter Jurisdiction**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) tests whether the court has subject matter jurisdiction." *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 900 (N.D. Cal. 2020). "Federal courts are courts of limited jurisdiction [and] possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

The government challenges this Court's subject matter jurisdiction because in its view two provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1252(b)(9) and 1252(g), strip this Court of subject matter jurisdiction where (1) Mr. Holani is challenging any actions taken by the government to remove him, or (2) the government was acting "to execute a removal order," *i.e.*, the removal order subsequently signed, allegedly under coercion, by Mr. Holani. 8

United States District Court
Northern District of California

U.S.C. §§ 1252(b)(9) and 1252(g) (respectively). In one respect, this challenge is facial: the government argues that, as a matter of law, the INA prevents this Court from having jurisdiction to hear Mr. Holani's petition. *See* ECF No. 17 at 5-9. But the challenge is nonetheless a factual one because there is no removal ordered pleaded in Mr. Holani's petition; it is the government that asserts the actions at-issue were taken to enforce a final order of removal, and Mr. Holani disputes the existence of any valid order of removal against him. *See, generally*, ECF Nos. 1, 17, 22; *Safe Air for Everyone*, 373 F.3d at 1039 ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."). Thus, the Court may consider all the evidence before it in resolving this challenge. *See id.*

### B. Preliminary Injunction

A preliminary injunction is a matter of equitable discretion and "an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 25 (2008). A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. Courts may still issue a preliminary injunction if a "plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits," if the balance of equities "tips sharply in the plaintiff's favor" and if the plaintiff establishes that they are likely to suffer irreparable harm and that an injunction is in the public interest. *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted). Where, as here, the government is a party, the last two *Winter* factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

## III. DISCUSSION

The Court addresses the issue of subject matter jurisdiction, raised by the government, before turning to the analysis of the preliminary injunction factors.

### A. The Court Has Subject Matter Jurisdiction to Hear Mr. Holani's Claims

The government argues that the Court lacks subject matter jurisdiction based on two provisions of the INA: 8 U.S.C. § 1252(b)(9) and 8 U.S.C. § 1252(g). The Court agrees with Mr. Holani that neither provision controls this case.

#### 1. This Case Does Not Concern Questions of Law or Fact "Arising From" Actions Taken to Remove Mr. Holani

Under the first provision, district courts are barred from reviewing "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from* any action taken or proceeding brought to remove an alien from the United States under this subchapter . . . ." 8 U.S.C. § 1252(b)(9) (emphasis added). So, the government argues, "this Court lacks jurisdiction to review the VPW order of removal issued against Petitioner and any action taken by Respondents to remove Petitioner, even on due process grounds." ECF No. 17 at 6. Plaintiff responds that the government misunderstands the nature of his claim: "Mr. Holani does not challenge removability with this habeas litigation; he challenges the constitutionality of his arrest, detention, and the process that preceded them[.]" ECF No. 22 at 7.[2] Anticipating this argument, the government asserts that Mr. Holani's challenge to the detention is itself a challenge to his removability, because "[i]f Respondents cannot briefly detain Petitioner to remove him, then Respondents cannot remove Petitioner *at all*. Pursuing a claim against his removal is exactly what Petitioner has done with this habeas petition."). ECF No. 17 at 4. But the Supreme Court has rejected such an expansive and "extreme" view of Section 1252(b)(9) in analogous circumstances:

> Assum[ing] for the sake of argument that the actions taken with respect to [petitioners, *i.e.*, being held in "'prolonged' detention in the absence of an individualized bond hearing"] . . . constitute "actions taken . . . to remove an alien from the United States . . . , the applicability of § 1252(b)(9) turns on whether the legal questions that we must decide 'arise from' the actions taken to remove these aliens. It may be argued that this is so [here] in the sense that if

[2] It is the Court's understanding, based on the parties' representations at the September 8, 2026 hearing, that Mr. Holani has filed an action challenging his removability on the merits, *i.e.*, under the VWP, at the Ninth Circuit. The effect of that action on this case is not presently clear, but it appears to support Mr. Holani's argument as to Section 1252(b)(9) that this action is challenging his arrest, detention, and the resulting coerced waiver via the signed Notice of Intent and final order of removal, while all substantive challenges to removability—*i.e.*, those not based on the due process violation alleged here—are channeled to the Ninth Circuit.

> those actions had never been taken, the aliens would not be in custody at all. But this expansive interpretation of § 1252(b)(9) would lead to staggering results. Suppose, for example, that a detained alien wishes to assert a [*Bivens*] claim [] based on allegedly inhumane conditions of confinement. . . . The "questions of law and fact" in all those cases could be said to "aris[e] from" actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention. But cramming judicial review of those questions into the review of final removal orders would be absurd.

*Jennings v. Rodriguez*, 583 U.S. 281, 292–93 (2018) (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.) (holding that Section 1252(b)(9) did not strip the court of jurisdiction to hear the challenge to prolonged detention without a bond hearing); *id.* at 355 (Breyer, Ginsburg, and Sotomayor, JJ., dissenting) (agreeing with the holding of the plurality that Section 1252(b)(9) did not bar jurisdiction, but dissenting on the merits).

Here Mr. Holani has independent, constitutional complaints about the lack of process preceding his arrest and detention. *See* ECF No. 22 at 7. Even if the Court assumes his arrest and detention at Oakland International Airport were "actions taken . . . to remove [him] from the United States," they do not *arise from* the government's removal actions in the legal sense explained in *Jennings*. *See* 583 U.S. at 292–93. The government does not cite any binding authority to the contrary. *See* ECF No. 17 at 5–6 (citing *Nielsen v. Preap*, 586 U.S. 392, 394 (2019) (holding that federal courts have jurisdiction to review factual challenges to orders resolving claims brought under the Convention Against Torture despite Section 1252(b)(9)); *Iasu v. Smith*, 511 F.3d 881, 884 (9th Cir. 2007) (applying Section 1252(b)(9) to bar jurisdiction where petitioner "challenges the government's power to remove him.")). And this Court is not persuaded by the few out-of-circuit authorities the government offers as analogous. *See id.* (relying on *Mahdawi v. Trump*, 183 F.4th 103, 116 (2d Cir. 2026) and *Khalil v. President, United States*, 164 F.4th 259, 274 (3d Cir. 2026), decisions applying Section 1252(b)(9) to bar jurisdiction over challenges to detention based on the First Amendment). Instead, the out-of-circuit authorities cited by the government appear in tension with *Jennings* and have been rejected by the Fourth Circuit, which explained:

> It comes as no surprise, then, that each and every time the Government has tried to invoke these *removal*-focused jurisdiction-stripping provisions to foreclose challenges to immigration

> *detention*, the Supreme Court has balked. This unbroken line of caselaw also accords with common sense: if a noncitizen is challenging their detention pending removal, then waiting for their removal proceedings does them no good. They have already been detained, allegedly in violation of the Constitution. This 'absurd' reading of the INA would make such detention claims 'effectively unreviewable,' and the Supreme Court has repeatedly refused to embrace it. *Jennings*, 583 U.S. at 293 (plurality).

*Suri v. Trump*, 184 F.4th 260, 284 (4th Cir. 2026) (collecting Supreme Court cases) (citations omitted).

In sum, Section 1252(b)(9) does not deprive this Court of jurisdiction to hear this case.

**2. 8 U.S.C. § 1252(g) Does Not Bar Jurisdiction, Because No Removal Order Existed at the Time of Mr. Holani's Detention**

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to . . . execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The government's argument under this subsection suffers from a similar but more fundamental flaw to its argument under Section 1252(b)(9): Mr. Holani is challenging his detention, which does not arise from any decision or action taken to execute removal order against him.

Again recognizing this issue, the government argues that "[a] brief detention necessary to execute a removal order is 'implicit in the concept of "removal" itself.'" ECF No. 17 at 7 (quoting *Diallo v. Joyce*, 817 F. Supp. 3d 202 (S.D.N.Y. 2025)). But the government's argument puts the proverbial cart before the horse. This is not a case where the government had a final order of removal, detained a noncitizen pursuant to it, and that detention is now being challenged. Rather, as the government made clear at the August 13, 2026 hearing, the final order of removal they rely upon **is the very order and Notice of Intent Mr. Holani states he only signed under coercion after the government arrested and restrained him.** *See* August 13, 2026 Hrg. Audio at 53:57–56:32,[3] 58:20–1:01:02; *see also* ECF No. 17 at 2.

[3] "COURT: When you say he's subject to a final order of removal, . . . what I'm taking away from [your argument is] essentially, that was something that existed the moment that he overstayed back in 2023. . . . Mr. Skewes-Cox: So, there is not a final order of removal the moment that he or anyone overstays. The process for removal under the [VWP] is that someone subject to removal under the [VWP] first has to be served with a notice of intent to issue a final administrative order of removal . . . and the final order of removal does not become effective" until after a noncitizen's



United States District Court
Northern District of California

In other words, the government in this case was not acting to execute a final removal order at the time it detained Mr. Holani. And it cannot rely on the retroactively obtained order of removal—one that was, allegedly, obtained under coercion—to slip this case in under the Section 1252(g) bar. To do so would allow the government to take any action, no matter how violative of the Constitution, so long as the actions ultimately resulted in the noncitizen "agreeing" to be removed. As explained further in Section III.B.1.c. *infra*, in considering the merits of Mr. Holani's request for a preliminary injunction that cannot be the case, and so Section 1252(g) does not apply to the cause of action here.

* * *

For the reasons explained above, neither Section 1252(b)(9) nor Section 1252(g) strip this Court of jurisdiction to hear Mr. Holani's claims. The Court proceeds to analyze whether a preliminary injunction pending resolution of the petition is warranted.

### B. Mr. Holani is Entitled to a Preliminary Injunction

A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Court addresses each of the *Winter* factors in turn and finds that Mr. Holani has met his burden on each factor and is entitled to a preliminary injunction.

#### 1. Mr. Holani is Likely to Succeed on the Merits of His Claim

Mr. Holani brings a petition for writ of habeas corpus challenging his arrest and detention on July 31, 2026, as violating his due process rights under the Fifth Amendment. ECF No. 1. "The Court analyzes petitioner's due process claim 'in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution.'" *Quispe v. Chestnut*, No. 25-cv-2002-CSK, 2026 WL 654577, at *4 (E.D. Cal.

---

claims for relief, *e.g.*, asylum, are resolved. "In this case, on July 31, Petitioner did not raise a claim to relief or contest that he had overstayed[,] . . . and so the final order was issued. **And so that is when he became subject to the final order of removal, not on the 91st day that he stayed in the United States**." (emphasis added).

Mar. 9, 2026) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)). As explained below, Mr. Holani is likely to show that the government's July 31, 2026 arrest and detention violated his due process rights.

**a. Mr. Holani Has a Protected Liberty Interest in Remaining Free from Detention**

At the first step, it is well-established that the Due Process Clause applies to noncitizens physically present within the United States, and "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The government does not dispute that Mr. Holani, a noncitizen physically present in the United States since 2023, has a protected liberty interest in his freedom from detention. *See, generally*, ECF Nos. 7, 17. Indeed, Mr. Holani has lived "openly" in this country for three years, acting as a caregiver for his grandmother and a devoted member of his local church and youth communities. *See, supra*, § I.A.; *E.g.*, *Marcos v. Warden, California City Detention Facility*, 26-CV-05638-TLN (CKD), 2026 WL 2389296, at *4 (E.D. Cal. Aug. 17, 2026) (finding that a noncitizen had a protected liberty interest in his continued freedom where he "has lived in this country since 2024, supporting his partner and her son, developing substantial ties to his community, and enduring connections of normal life."). This interest is strengthened by the fact that Mr. Holani has at least three times travelled by flight between Seattle and Oakland, such that DHS, through TSA, was necessarily aware of Mr. Holani on each of his previous commercial flights, yet they allowed him to present himself at the security check point and continue on his way. *Cf. id.* at *5 ("Government's actions in allowing petitioner to remain in the community for over [three] years strengthened petitioner's liberty interest.").

**b. Considering the *Mathews v. Eldridge* Factors, Mr. Holani was Entitled to a Pre-Deprivation Hearing**

Turning to the second step, the questions remain: what process was Mr. Holani due prior to his arrest and detention? What process is he due now if the government wishes to continue to detain him? Under *Mathews v. Eldridge*, courts consider three factors in determining what process

was due: (1) the private interest affected; (2) the risk of an erroneous deprivation; and (3) the government's interest. 424 U.S. 319 (1976).

First, the private interest affected is significant. As explained above, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Mr. Holani's deep ties with his community further strengthen that interest including his volunteer work with his local church and his community. He is also close with both his mother and stepfather, who live in Oakland, and he serves as a caregiver to his elderly grandmother in Seattle, travelling between Oakland and Seattle frequently. *Id.* ¶¶ 1, 4–5, 7, 29–30; Lota Reply Decl. ¶¶ 2, 4–8; Viliami Decl. ¶¶ 2–5; Holani Reply Decl. ¶¶ 4, 6 (Mr. Holani's grandmother "depends on [his] support for key physical demands around the house, including running errands, household duties, grocery shopping, and gardening.").

Moreover, Mr. Holani has a second interest in that he is seeking to adjust his status to that of a lawful immigrant based on the sponsorship of his U.S.-citizen stepfather, an interest jeopardized by the allegedly unlawful detention subsequent coercively obtained removal order. *See* ECF No. 22 at 15 ("USCIS policy permits adjudication of adjustment applications from immediate-relative Visa waiver entrants unless a removal order under 8 C.F.R. § 217.4(b) has been issued—meaning the only thing standing between Mr. Holani and an adjudicable application is the order they obtained through the July 31 signature.").[4]

Second, the risk of erroneous deprivation is serious. Because immigration detention is civil and not criminal in nature, it is constitutionally permissible only when it serves a legitimate purpose, *i.e.*, "ensuring the appearance of aliens at future immigration procedures" and "[p]reventing danger to the community." *Id.*; *see also Demore v. Kim*, 538 U.S. 510, 526, 528 (2003) ("[T]he Government may constitutionally detain deportable aliens during the limited period

[4] The government argues his intent to file this application emerged only after this case, but Mr. Holani's avers that his "stepfather had already agreed to sponsor [him] so that [he] could apply for lawful permanent residence" before he was detained. Holani Reply Decl., ¶ 26. The government also argues that intent is speculative but, to the extent it ever was, this interest is no longer speculative insofar as it relates to Mr. Holani's continued detention because the application has since been filed. *See* ECF No. 22-5.

necessary for their removal proceedings. . . . Such detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings."). Here, the government does not and cannot contend that Mr. Holani is a danger to the community – Mr. Holani has no criminal record and no history of immigration enforcement contact of any kind prior to the events of July 31, 2026. *See* ECF No. 1 ¶¶ 3, 28, 31; Holani Reply Decl. ¶¶ 2, 5. It is also unlikely that Mr. Holani will present a flight risk, both in light of having lived in the United States "openly," including boarding domestic flights, in the past as well as his ties to his U.S.-citizen stepfather and green-card-holder mother, who aver they will ensure he appears for future proceedings. *E.g.*, Viliami Decl. ¶ 16 ("Cornelius is a good young man who belongs at home with his family, not in a jail cell. He is not a danger to anyone, and he wasn't trying to run away. As his father, I give my word that I will make sure he shows up for any meeting the government asks for.").

"Finally, with regard to the third *Mathews* factor, this Court recognizes that the government has an interest in enforcing immigration laws, but respondents' interest in detaining petitioner without a hearing is 'low.'" *Id.* at *5. Balancing these factors as other courts have done in the context of VWP noncitizen detentions, the Court finds that if Mr. Holani is deportable as a VWP overstay, after the government has a non-coerced order of removal (either because this Court determines after an evidentiary hearing that the July 31, 2026 order and notice were not coerced, or because a neutral immigration judge issues a new order of removal) then the government may conclude that Mr. Holani's detention is warranted during a bond hearing.

**c. The Government's Counterarguments Are Unpersuasive**

The government's arguments to the contrary either misapply the relevant law or rely on disputed facts that the Court, weighing the evidence before it, finds are unsupported at this stage. As an initial matter, the government appears to argue that, even absent an order of removal, Mr. Holani could be detained as a violator of the VWP under 8 U.S.C. § 1187. *See* ECF No. 7 at 4–5; ECF No. 17 at 4. To the extent the government makes this argument, it is incorrect. "[M]ost federal courts that have directly addressed whether a noncitizen who has violated the Visa Waiver Program can be detained pursuant to § 1187(c)(2)(E) have held that § 1187(c)(2)(E) is not a valid

basis for detention." *Quispe*, 2026 WL 654577, at *2 (collecting cases).

But the bulk of the government's argument is that Plaintiff now *must* be detained pursuant to 8 U.S.C. § 1231(a), which requires the government to detain a noncitizen found to be removable—*i.e.*, subject to a final order of removal—during the 90-day removal period beginning on, *inter alia*, "[t]he date the order of removal becomes administratively final." ECF No. 7 at 4–5; ECF No. 17 at 9. This argument suffers from several flaws.

First, as already explained above, the government conceded at the hearing on August 13, 2026, that there *was no final order of removal* before the government arrested Mr. Holani on July 31, 2026. *See* August 13, 2026 Hrg. Audio at 53:57–56:32. So, to the extent this argument has any force, it can apply only to Mr. Holani's request for an injunction against continued or re-detention.

Second, on that score, Mr. Holani alleges that the final order of removal was only procured because he was coerced into signing it. The government replies that it did no such thing and that it doesn't matter if it did. The first part of the government's argument is unpersuasive: Mr. Holani has submitted a verified petition and declarations from himself, his mother, and his stepfather averring that he was coerced via intimidating circumstances (being shackled during transportation; having two ICE officers standing by him, one holding the door, while he signed) and via deception, as he received a pre-checked form and was told by the ICE officer that the papers he was signing had nothing to do with deportation. *See, supra*, § I.B. By contrast, the government has submitted a bare declaration with the only relevant averments being: "I did not coerce Mr. Holani to sign any document. I did not tell him that the documents had nothing to do with deportation." ICE Decl. ¶¶ 7–8.[5] Although an evidentiary hearing or discovery may be required to ultimately resolve the issue of coercion, the weight of the evidence at this preliminary stage supports Mr. Holani, and he is likely to prove that he was coerced.

And the overarching thrust of the government's argument is the most troubling. In taking this position, the government argues that, even if the initial detention was unconstitutional because

---

[5] During the August 13, 2026 hearing, counsel for the government represented that he thought Petitioner checked the box himself. At best, this is another disputed fact to be resolved.

Mr. Holani was entitled to a pre-deprivation hearing, and even if Mr. Holani was in fact coerced into signing the final order of removal, it is too late. *See* ECF No. 17 at 9, 11. If a noncitizen is deceived, as Mr. Holani alleges he was here, it does not matter; if they are forced to sign a final order of removal at gunpoint, it does not matter. *Id*. A final order means he must be detained, and his signature means he cannot challenge that final order in any way, and that's that, says the government. Such a position is antithetical to notions of due process, and to the contrary, waivers of rights by those the government seeks to deport must generally be "considered and intelligent." *Cf. United States v. Lopez-Vasquez*, 1 F.3d 751, 753 (9th Cir. 1993) (a noncitizen's waiver of the right to judicial review of his deportation order must be considered and intelligent); *United States v. Mendoza-Lopez*, 481 U.S. 828, 840 (1987) (deportation order obtained in violation of due process could "not be used to enhance the penalty for an unlawful entry" under a criminal statute). Accordingly, if Mr. Holani was coerced into waiving his right to contest removal and signing the final removal order, the government may not use them to re-detain him.

**d. To the Extent Required, Mr. Holani is Likely to Show He Was Prejudiced by the Detention**

Finally, the government also argued at the August 13, 2026 hearing (and alluded to in its papers) that, even if Mr. Holani was successful in showing he was deprived of due process, he cannot succeed in his petition because there is no prejudice to that deprivation. August 13, 2026 Hrg. Audio at 1:03:55–1:04:52; *see also* ECF No. 7 at 5–6; ECF No. 17 at 9-10. Specifically, the government argues that Mr. Holani is removable for overstaying his VWP authorization and has suffered no other consequences as a result. *See id.* The government's argument provides no authority for the proposition that a separate showing of prejudice, apart from the unconstitutional deprivation of liberty, is required to prevail on a petition for writ of habeas corpus. But even if a separate showing of prejudice was required, Mr. Holani has met that bar.

First, Mr. Holani has shown that the detention included the allegedly coercive encounter where he was deprived of the right to consult an attorney and present evidence prior to responding to the notice of intent, and the guarantee of a 48-hour period to respond. *See, supra*, § I.B. Denial of counsel at immigration proceedings, without a further showing that the absence of an attorney

was specifically prejudicial, is sufficient prejudice. *Cf. Montes-Lopez v. Holder*, 694 F.3d 1085, 1093–94 (9th Cir. 2012) ("[A]n alien who shows that he has been denied the statutory right to be represented by counsel in an immigration proceeding need not also show that he was prejudiced by the absence of the attorney.").

Second, Mr. Holani has shown particularized prejudice as to the effect that the detention may have on his application for adjustment of status. The government correctly notes that noncitizens who overstay their VWP authorization are ordinarily ineligible for adjustment of status. *See Momeni v. Chertoff*, 521 F.3d 1094, 1096–97 (9th Cir. 2008). But as Mr. Holani points out, Congress provided a limited exception for VPW overstays with immediate-relatives that are U.S. citizens. *See* 8 U.S.C. § 1255(c)(4) (adjustment of status "shall not be applicable to . . . (4) an alien (**other than an immediate relative as defined in section 1151(b) of this title**) who was admitted as a nonimmigrant visitor without a visa under section 1182(l) of this title or section 1187 of this title" (emphasis added)); *id.* § 1151(b)(2)(A)(i) ("For purposes of this subsection, the term 'immediate relatives' means the children, spouses, and parents of a citizen of the United States."). Mr. Holani first raised Section 1255 in his reply, however, and the government has not had a chance to respond. So, it is not clear whether Mr. Holani is ultimately admissible or will be admitted. But given the clear text of Section 1255, it appears likely at this stage that Mr. Holani will succeed in his argument that "the only thing standing between Mr. Holani and an adjudicable application is the order [the government] obtained through the July 31 signature." *See* ECF No. 22 at 21–22.

**2. Mr. Holani Has Made a Sufficient Showing on the Other Factors**

As for the remaining *Winter* factors, the government does make independent arguments contesting them. *See* ECF No. 7 at 6–7 (arguing that, because Mr. Holani cannot show a likelihood of success on the merits, there is no irreparable harm and the balance of equities and the public interest tip toward the government). Even so, the government's argument does not acknowledge that unconstitutional deprivation of physical liberty constitutes irreparable harm. *See Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017).

As for the balance of equities and the public interest factors of the TRO inquiry, these

factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). They tip sharply in Mr. Holani's favor here. "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Domingo v. Kaiser*, No. 25-CV-05893 (RFL), 2025 WL 1940179, at *4 (N.D. Cal. July 14, 2025) (citations omitted). And the comparative harm to the government is minimal – a short delay, pending resolution of the disputed facts herein and ultimately of Mr. Holani's petition. *See id.* Moreover, if Mr. Holani is deportable as a VWP overstay, the government need only show, before a neutral arbiter, that detention is warranted ***after*** procuring a non-coerced order of removal. Fundamentally, "a party 'cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.'" *Id.* (quoting *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983)).

## IV. CONCLUSION

Petitioner challenges his arrest and detention on July 31, 2026, and any continued or renewed detention in the absence of a non-coerced order of removal and a pre-deprivation hearing. *See* ECF Nos. 1, 22. He does not challenge his removability via this action. ECF No. 22 at 7. At the heart of the parties' dispute is Petitioner's allegation and evidence, and the government's denial, that he was coerced into signing the operative order of removal. The Court requires an evidentiary hearing to resolve these matters including, at a minimum, the testimony of Mr. Holani and the two ICE officers present in the room on July 31, 2026.

The Court **ORDERS** as follows:

- The Court sets a case management conference for October 5, 2026 at 1:30 p.m., which shall be converted to an evidentiary hearing if the parties inform the Court that they and their witnesses are available on that date.
- The parties shall meet and confer regarding the extent of the evidentiary hearing required and any evidence they wish to collect and present. After meeting and conferring, they shall file a joint status report by September 21, 2026, setting forth:
    - The witnesses each side intends to call;

United States District Court
Northern District of California

  - The subject matter of each witness' expected testimony; and
  - The expected length of the testimony and any expected cross-examination.
  - The parties must also stipulate to a requested hearing date and, to the extent warranted, a post-hearing briefing schedule;
  - Whether the parties and witnesses are available on October 5, 2026, and if not, whether the parties are available on either October 6 or October 13 as alternative dates for the evidentiary hearing.
- The Court enters a preliminary injunction, enjoining the government from re-detaining Petitioner or from removing Petitioner from the United States, until either (a) the Court has held an evidentiary hearing and ruled on the petition or (b) the government has a final administrative order of removal not tainted by the allegedly coercive conduct at issue here and has demonstrated, by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker, that petitioner is a flight risk or danger to the community such that his physical custody is legally justified.
- The Court's injunction does not enjoin or prevent the government from lawfully detaining Petitioner on the basis of any criminal conduct or criminal history, absent a final order of removal, as it would in the ordinary course of criminal enforcement.

**IT IS SO ORDERED.**

Dated: September 8, 2026

Noël Wise
United States District Judge